IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>RENEWABLE ENERGY DEVELOPMENT CORPORATION,<br><br>Debtor. | |
| ELIZABETH R. LOVERIDGE,[1]<br><br>Plaintiff,<br><br>vs.<br><br>TONY HALL, et al.,<br><br>Defendants. | MEMORANDUM DECISION<br><br>AND ORDER<br><br>Case No. 2:12-cv-771 |

The Defendants have filed a Joint Motion to Withdraw the Reference for Adversary

Proceeding 12-2225.  (Dkt. No. 2.)  This adversary proceeding is currently pending in the United

States Bankruptcy Court for the District of Utah and involves allegations that the Defendants

violated the automatic stay in the underlying bankruptcy proceeding, Case No. 11-38145.  For the

reasons discussed below, the court denies the Defendants' Motion without prejudice to refile

when the claims in the adversary proceeding are ready for trial.

BACKGROUND

The debtor in the underlying bankruptcy action, Renewable Energy Development

Corporation (REDCO), filed for relief under Chapter 7 of the United States Bankruptcy Code on

---

[1]While the court has not yet explicitly ruled on the Trustee's Motion to Substitute Party (Dkt. No. 9), the court recognizes that Elizabeth R. Loveridge was appointed Trustee of the bankruptcy estate on August 7, 2012.  Accordingly, the court grants the Trustee's Motion and substitutes Ms. Loveridge as the Trustee in this proceeding.

December 30, 2011.  George B. Hofmann was then appointed as the Chapter 7 Trustee.

REDCO's general business model was to negotiate packages of contract and leasehold rights to

develop solar and wind energy projects.  REDCO also hired contractors to implement these

projects.  On January 30, 2012, Mr. Hofmann received an Order from the bankruptcy court

authorizing the sale of substantially all of REDCO's assets to Sustainable Power, LLC.  But this

sale did not include twelve Lease Option Agreements that REDCO had previously negotiated

with various landowners in San Juan County, Utah.  These option contracts were included in a

group of assets called the Blue Mountain assets.

 The legal status of the Lease Option Agreements was somewhat unclear.  The contracts

granted REDCO an exclusive option that could be exercised over a period of three years to lease

and obtain easements on property owned by the San Juan County landowners for the

development of renewable energy projects.  In exchange for the grant of the option, REDCO

agreed to pay $1,000 to each of the landowners within thirty days after the Lease Option

Agreements were executed.  It appears that REDCO never gave the landowners the $1,000

payments.  But the Lease Option Agreements also stated that the landowners had to provide

REDCO with notice and an opportunity to cure before the landowners could exercise any of their

rights or remedies under the Agreements, including any right to terminate.  The Trustee alleges

that none of the landowners provided REDCO with notice or an opportunity to cure any alleged

deficiencies under the Agreements.

 According to Defendants Tony Hall, Ellis-Hall Consultants, LLC (Ellis-Hall) and Summit

Wind Power, LLC (Summit Wind)[2] (collectively, the Hall Parties), Mr. Hofmann contacted them around January 5, 2012, seeking their expertise to evaluate REDCO's assets. Mr. Hofmann allegedly asked the Hall Parties to travel to southern Utah to conduct due diligence on the Lease Option Agreements and to report back to him. The Hall Parties contend that Mr. Hofmann ultimately encouraged them to submit bids to purchase the Blue Mountain assets. Because Mr. Hall and Ellis-Hall believed that the Lease Option Agreements failed for lack of consideration, they submitted to Mr. Hoffman a low bid of $3,000 for REDCO's remaining assets. The Hall Parties believe that Mr. Hofmann then used this bid to generate interest in the project and obtain a higher bid from another company, Cedar City Wind Holdings, LLC (CCW).

On February 28, 2012, Mr. Hofmann filed a motion to approve the sale of the Blue Mountain assets to CCW. Mr. Hofmann claims that the Hall Parties never objected to this sale and that they did not appear at the auction that was held on March 21, 2012. The prevailing bidder at the auction was CCW, who submitted a winning bid of $210,000. The bankruptcy court approved this sale at a hearing held on March 22, 2012.

Mr. Hofmann alleges that, at some point in either February or March 2012, the Hall Parties contacted the landowners who had signed the Lease Option Agreements with REDCO and advised them that the Agreements were void because REDCO never paid the agreed fee of

---

[2]In the Complaint filed in Adversary Proceeding 12-2225, Mr. Hofmann alleges that Ellis-Hall and Summit Wind are both controlled by Tony Hall. (Dkt. No. 1 in Case No. 12-2225.) In its Answer, Counterclaim, and Third-Party Complaint, Summit Wind states that its principal and sole owner is Kimberly Ceruti, who is also a minority owner and Executive Director of Ellis-Hall. (Dkt. No. 23 in Case No. 12-2225.) Ms. Ceruti joined Summit Wind's responsive pleading in the adversary proceeding as a Counterclaimant and Third-Party Plaintiff. For purposes of this Order, the court distinguishes Ms. Ceruti from the Hall Parties, although the Hall Parties include Summit Wind.

$1,000.  Mr. Hofmann believes that the Hall Parties then entered into new agreements with some of the landowners.  As a result of these actions, Mr. Hofmann contends that CCW refused to close on the sale of the Blue Mountain assets that the bankruptcy court had approved.  On March 23, 2012, Mr. Hofmann sent a cease and desist letter to Mr. Hall and Kimberly Ceruti asserting that they were violating the automatic stay.  Mr. Hofmann then filed a Motion for Order to Show Cause why Tony Hall, Ellis-Hall, and certain landowners should not be held in contempt of the automatic stay provisions of the Bankruptcy Code.  On April 12, 2012, the bankruptcy court held a hearing in which it withdrew and struck the Trustee's Motion.

On May 28, 2012, Mr. Hofmann commenced an adversary proceeding against the Hall Parties and several landowners[3] who had allegedly executed new agreements with the Hall Parties in violation of the automatic stay.  Mr. Hofmann included four causes of action in his Complaint: 1) declaratory judgment that the Lease Option Agreements were valid and part of the bankruptcy estate; 2) declaratory judgment that any agreements entered into between the landowners and the Hall Parties violated the automatic stay and were void; 3) damages for violating the automatic stay; and 4) damages for tortious interference with economic relations. Summit Wind and Ms. Ceruti filed a Counterclaim and Third-Party Complaint asserting a number of claims against Mr. Hofmann and his law firm: breach of fiduciary duty, malpractice, breach of contract, tortious interference with contract and prospective economic advantage, unjust enrichment, conversion, and declaratory relief stating that the Lease Option Agreements were void and disqualifying Mr. Hofmann and his law firm from acting as Trustee in the

_____

[3]The landowners are: SSP, a trust of which Scott Rasmussen is the Trustee; Clay and Diane Christiansen; Richard Francom; and Stephen and Bonnie Meyer.

underlying bankruptcy.

Around the same time, Mr. Hofmann filed a second motion to sell the Blue Mountain assets after he had negotiated a new agreement with CCW to sell the assets for $105,000, or half of CCW's original bid. The Hall Parties and several landowners, the Christiansens and Mr. Francom, filed objections to the Trustee's motion. These parties argued that the Lease Option Agreements automatically terminated when REDCO failed to pay the $1,000 option payment.

The bankruptcy court heard the Trustee's Second Sale Motion and the Honorable Judge William T. Thurman issued his ruling from the bench on June 20, 2012. (*See* Dkt. No. 25 in Case No. 12-2225.) Judge Thurman considered the question of whether the Lease Option Agreements were still valid even though REDCO had failed to pay the consideration for the options. He found that, considering the contract as a whole, and because none of the landowners gave REDCO any written notice of default, the Lease Option Agreements did not automatically terminate. As a result, Judge Thurman ruled that the Trustee could sell the Blue Mountain assets to CCW "free and clear of all liens, claims, interests and any other encumbrances of any nature." (Hr'g Tr. 17, June 20, 2012, Dkt. No. 148 in Case No. 11-38145.) But Judge Thurman also made clear that it was "not incumbent upon the Court to make detailed findings that the trustee [had] absolute clear and unequivocal title to the Blue Mountain assets" since the court only needed to consider whether the estate had "sufficient interest in the property to convey it." (*Id.* at 25.) He emphasized that he was not quieting title to the lease options, but simply authorizing the Trustee to sell whatever interest the estate had in those assets: "I'm only authorizing the trustee to sell whatever he's got as-is, where-is, if-is." (*Id.*)

On July 20, 2012, Mr. Hall and Ellis-Hall moved to withdraw the reference of the

adversary proceeding from the bankruptcy court. Ms. Ceruti and Summit Wind later joined this

motion. These four parties also submitted requests for a jury trial of the claims in the adversary

proceeding.

ANALYSIS

Ms. Ceruti and the Hall Parties argue that withdrawal of the bankruptcy reference is

mandated for two reasons. First, they contend that there is cause for withdrawal under 28 U.S.C.

§ 157(d) because they have made a demand for a jury trial. Second, the Defendants assert that

the bankruptcy court does not have the constitutional authority to issue a final ruling on the

claims and counterclaims in the adversary proceeding because these claims must be decided by a

tribunal created under Article III of the United States Constitution. The court agrees that the

Defendants may insist on a jury trial for some of their claims, but finds that there is no reason to

withdraw the bankruptcy reference until these claims are ready for trial. The court disagrees with

the Defendants' Article III argument and holds that the bankruptcy court has authority to issue a

final ruling on the causes of action that are the subject of the Defendants' motion..

To give some context to the claims at issue in this suit, the court first reviews a brief

history of the relationship between bankruptcy courts and Article III courts.

I.       **Legal Background on the Authority of the Bankruptcy Courts**

The Bankruptcy Reform Act of 1978 created bankruptcy courts as adjuncts to the district

court for each judicial district. Pub. L. No. 95-598, 92 Stat. 2549 (1978). The Act provided that

the new bankruptcy courts would be presided over by bankruptcy judges appointed by the

President and confirmed by the Senate for fourteen-year terms. In 1982, the Supreme Court held

that this grant of bankruptcy jurisdiction to independent courts composed of judges who did not

have life tenure or other Article III protections was unconstitutional. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). In response to the Court's ruling, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub. L. No. 98-353, 98 Stat. 333 (1984). This Act vested jurisdiction over bankruptcy actions in the Article III district courts, but allowed the district courts to refer cases and proceedings to the bankruptcy judges for the district. The Act provided that a district court "may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d).

The 1984 Act divided the types of issues that a bankruptcy court may hear into two categories: core and non-core proceedings. *See* 28 U.S.C. § 157(b). The statute provides a non-exclusive list of core proceedings for which the bankruptcy judge may enter final orders and judgments. The statute also states:

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under [Title 11, the primary source of bankruptcy law in the United States Code]. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

28 U.S.C. § 157(c)(1). Notwithstanding this provision, parties may consent to allow a bankruptcy judge to enter final judgments on non-core proceedings if they wish. *See* 28 U.S.C. § 157(c)(2). Bankruptcy judges have the authority to determine "whether a proceeding is a core proceeding . . . or is a proceeding that is otherwise related to a case under title 11." 28 U.S.C. § 257(b)(3).

The Supreme Court has issued two decisions interpreting the 1984 Act that provide the

crux of the analysis for the issues currently before the court.  In 1989, the Court held in

*Granfinanciera, S.A. v. Nordberg* that defendants in a fraudulent conveyance action brought by

the trustee retained a right to a trial by jury under the Seventh Amendment of the United States

Constitution.  492 U.S. 33 (1989).  While fraudulent conveyance actions are listed as core

proceedings under 28 U.S.C. § 157(b)(2)(H), the Court found that these actions are matters of

private rather than public right because they are "quintessentially suits at common law that more

nearly resemble state-law contract claims."  *Id.* at 56.  Based on this reasoning, the Court held

that, notwithstanding Congress's designation of fraudulent conveyance actions as the sort of

bankruptcy issues for which bankruptcy judges could issue final judgments, this designation

could not trump a party's Seventh Amendment right to request a jury trial.  But the Court

emphasized that its ruling applied only to parties who had not submitted claims against the

bankruptcy estate, since these types of fraudulent conveyance actions did not arise "as part of the

process of allowance and disallowance of claims," and were not integral to the restructuring of

debtor-creditor relations.  *Id.* at 58.  And, importantly, the Court highlighted that it was not

addressing the question of "whether the Seventh Amendment or Article III allows jury trials in

such actions to be held before non-Article III bankruptcy judges subject to the oversight provided

by the district courts pursuant to the 1984 Amendments."  *Id.* at 64.  In other words, while the

Court held that a jury trial was required in certain circumstances, the Court was silent as to

whether a bankruptcy court could issue final judgments on dispositive motions in these cases or

whether the bankruptcy court could conduct the jury trial itself.[4]

---

[4]The Tenth Circuit has since ruled that jury trials must be conducted by the district court. *In re Kaiser Steel Corp.*, 911 F.2d 380, 392 (10th Cir. 1990).

The Court addressed the question of the authority of bankruptcy courts to issue final judgments in the 2011 case of *Stern v. Marshall*, 131 S. Ct. 2594 (2011). The facts of *Stern* involve the bankruptcy estate of Vickie Lynn Marshall, who was better known to the public as Anna Nicole Smith. Vickie was involved in a long-running dispute with E. Pierce Marshall, who was the son of Vickie's husband, J. Howard Marshall II, a man believed to have been one of the richest people in Texas. While J. Howard was still alive, Vickie filed suit against Pierce in Texas state probate court asserting that Pierce had fraudulently induced J. Howard to sign a living trust that did not include her. After J. Howard's death, Vickie filed a petition for bankruptcy. Pierce then filed a complaint and a proof of claim in the bankruptcy proceeding alleging that Vickie had defamed him and seeking damages from her estate. Vickie filed a counterclaim against Pierce in which she made the same allegations that she had previously filed in state court—namely, that Pierce had tortiously interfered with the inheritance she expected from J. Howard. Eventually, the Texas state court ruled in Pierce's favor while the bankruptcy court ruled in favor of Vickie. The bankruptcy court's determination was appealed all the way to the Supreme Court.

The Supreme Court held that, while the bankruptcy court had statutory authority to enter a final judgment on a state law counterclaim under 28 U.S.C. § 157(b)(2)(C), the bankruptcy court was nevertheless without constitutional authority to enter such a judgment under Article III. The Court found that Vickie's claim was "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on [Pierce's] proof of claim in bankruptcy." *Id.* at 2611. Stated another way, Vickie's state tort action existed "without regard to any bankruptcy proceeding." *Id.* at 2618. Because her claim was so remotely connected to the underlying bankruptcy action, the Court ruled that an Article III court was required to enter final judgment.

Before reaching its decision, the Court considered whether the bankruptcy court's authority to enter final judgment on Vickie's counterclaim could be saved by the public rights exception, under which Congress may permissibly vest factfinding for public rights in a non-Article III court. The Court noted that "it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular federal government action." *Id.* at 2613. In its analysis, the Court referenced its discussion of public and private rights in *Granfinanciera* and held that the public rights exception did not apply in either case: "Vickie's counterclaim—like the fraudulent conveyance action in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception." *Id.* at 2614.

Given this analogy, several courts have interpreted the decision in *Stern* to apply to a wide variety of state law claims, such as fraudulent conveyance actions, that arise in a bankruptcy context but can more accurately be seen as private and not public rights. As a result, these courts have held that bankruptcy courts lack authority to enter final judgments on these claims. *See, e.g.*, *In re Heller Ehrman LLP*, 2011 WL 6179149 (N.D. Cal. Dec. 13, 2011) ("By likening the claim [in *Stern*] explicitly to the fraudulent conveyance claims in *Granfinanciera*, this Court believes that *Stern* clearly implied that the bankruptcy court lacks constitutional authority to enter final judgment on the fraudulent conveyance claims presented here . . . ."); *Adelphia Recovery Trust v. FLP Grp., Inc.*, 2012 WL 264180 (S.D.N.Y. Jan. 30, 2012) (finding that a fraudulent transfer claim was beyond the bankruptcy court's final adjudicatory power because it involved a private right, its adjudication would not necessarily be decided by ruling on a third party proof of claim, and the Defendants had not consented to final adjudication by the bankruptcy court).

But this reading of *Stern* is a broad one, implying that bankruptcy courts cannot enter

final judgments on any claims that could be subject to a proper jury request under *Granfinanciera*. Many courts have adopted a much narrower interpretation of *Stern* by pointing to the Supreme Court's own characterization of the breadth of its ruling: "We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a narrow one." *Stern*, 131 S. Ct. at 2620.

The Honorable Robert D. Drain, a bankruptcy judge for the Southern District of New York, has elaborated on the reasoning behind the narrow interpretation. Judge Drain noted that, even after *Granfinanciera*'s characterization of fraudulent conveyance actions as private rights, "by far the majority of courts after *Granfinanciera* continued to hold that bankruptcy courts had the power to issue a final judgment in fraudulent transfer proceedings as core matters." *Kirschner v. Agoglia (In re Refco Inc.)*, 461 B.R. 181, 190 (Bankr. S.D.N.Y. 2011). While acknowledging that it was likely that "the majority in *Stern* would have concluded, if asked, that a bankruptcy judge lacks the power to issue a final order or judgment on a fraudulent transfer claim," Judge Drain noted that the other express rationales for the majority's decision, which are summarized by Justice Scalia in his concurrence,[5] "argue differently. They are . . . entirely consistent with the role of fraudulent transfer and other statutory avoidance claims under the Bankruptcy Code . . . and with the clear majority of holdings after *Marathon* and *Granfinanciera* that bankruptcy courts have the constitutional power to issue final judgments on statutory

---

[5]Some courts have additionally supported a narrow reading of *Stern* on the grounds that Justice Scalia, while joining in the judgment, did not adopt the reasoning of the Chief Justice's plurality opinion. *See, e.g.*, *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 2012 WL 112503 (Bankr. D. Del. Jan. 12, 2012) ("[A] majority of the justices did not adopt the rationale of Chief Justice Roberts' opinion, giving impetus to a narrow interpretation.").

avoidance claims." *Id.* at 191.

In the two years since *Stern* has been decided, a large number of courts have written opinions applying *Stern* to various aspects of bankruptcy proceedings. Having carefully reviewed this voluminous case law, it is clear that the courts have not reached any general consensus about how to interpret the Supreme Court decision. Even within the same judicial district, opinions about the case often differ wildly. *Compare Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 467 B.R. 712, 721 (S.D.N.Y. 2012) (holding that Judge Drain's reasoning in the *In re Refco, Inc.* case discussed above "runs directly contrary to the clear language of *Stern*") *with Walker, Truesdell, Roth & Assocs. v. Blackstone Grp., L.P. (In re Extended Stay, Inc.)*, 466 B.R. 188, 202 (S.D.N.Y. 2011) ("*Stern* does not affect the ability of the bankruptcy court to rule on state law fraudulent conveyance claims.").

The Tenth Circuit has not yet issued any guidance on the issue. Within the District of Utah, only the Honorable Ted Stewart has addressed *Stern*'s reach. *See In re C.W. Min. Co.*, 2012 WL 4882295 (D. Utah Oct. 15, 2012); *In re Rock Structures Excavating, Inc.*, 2013 WL 1284969 (D. Utah Mar. 27, 2013). Judge Stewart read *Stern* narrowly and held that the Supreme Court decision does not preclude a bankruptcy court from entering final judgment in a fraudulent conveyance action. *In re Rock Structures Excavating, Inc.*, 2013 WL 1284969, at *5. Judge Stewart also noted that the majority of district and bankruptcy courts within the Tenth Circuit to consider *Stern* have adopted a narrow view of the case. *Id.* (citing examples).

The court considers below the implications of *Stern* for the Defendants' pending Motion to Withdraw the Reference. But the court first addresses whether the Defendants have a right to a jury trial on any of their counterclaims or the claims asserted against them.

**II.     The Defendants' Right to a Jury Trial**

<u>A.  Existence of the Right</u>

The Seventh Amendment provides that the right to a trial by jury shall be preserved in suits at common law where the controversy exceeds twenty dollars.  U.S. Const. amend. VII.  As discussed above, the Supreme Court held in *Granfinanciera* that a party maintained her right to a jury trial for certain matters that arose during a bankruptcy proceeding even if the bankruptcy court had the statutory authority to hear those matters.  *Granfinanciera*, 492 U.S. at 64.  The Court used a three-part analysis to determine which claims could be the subject of a proper jury demand.  First, a court must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity."  *Id.* at 42.  Second, a court must "examine the remedy sought and determine whether it is legal or equitable in nature."  *Id.* As the Court noted, "[t]he second stage of this analysis is more important than the first."  *Id.*  If these two factors indicate that a party is entitled to a jury trial, a court must decide "whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder."  *Id.*

The claims and counterclaims at issue in this case present a mix of legal and equitable actions.  Applying the first prong of the test stated above, some of the claims are clearly examples of actions that historically would be tried by a jury.  For example, the Trustee's action for tortious interference with economic relations is a tort that was recognized at common law. *See* W. Prosser, Handbook of the Law of Torts §§ 128-30 (4th ed. 1971).  Actions sounding in tort were considered legal before the merger of the courts of law and equity and are therefore subject to a proper jury demand.  *See Curtis v. Loether*, 415 U.S. at 189, 195 (1974).  Similarly,

the counterclaims for malpractice, breach of contract, tortious interference with contract and prospective economic advantage, and conversion are legal actions.  In contrast, actions for breach of fiduciary duty historically were considered equitable.  *See, e.g.*, *In re Evangelist*, 760 F.2d 27, 29 (1st Cir. 1985) ("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity,' carrying with them no right to trial by jury.").  And the proper characterization of actions for unjust enrichment is unclear.  *See In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 190 (D. Me. 2010) (comparing courts holding that an action for unjust enrichment is an equitable claim with courts ruling that the proper characterization of these claims depends on the remedy requested).

The second prong of the *Granfinanciera* analysis instructs the court to look at the nature of the relief sought.  Here, both parties seek mostly compensatory damages for their claims, a remedy which is legal in nature.  The Trustee seeks to recover the damages caused by the Defendants' alleged interference with the sale of the Lease Option Agreements, while Ms. Ceruti and Summit Wind argue that the Trustee's actions injured them by an amount in excess of $500,000.  The nature of the requested remedy supports the Defendants' demand for a jury trial on the claims for tortious interference, malpractice, breach of contract, and conversion.

Ms. Ceruti and Summit Wind also seek compensatory damages for their breach of fiduciary duty claim.  While historically this claim has been treated as an equitable one, the Supreme Court stated that the nature of the remedy is a more important consideration than the historical treatment of a claim.  *See Granfinanciera*, 492 U.S. at 42.  And at least one district court has noted that, for certain equitable claims seeking legal remedies, the nature of the remedy is determinative of the right to a jury trial even if the courts of equity once issued the same type

14

of legal relief.  *See, e.g.*, *Addington v. US Airline Pilots Ass'n*, 2009 WL 413610, at *4 (D. Ariz. Feb. 18, 2009) (noting that "[i]t is of no moment that as a matter of historical practice, courts of equity would grant monetary awards against trustees who breached their fiduciary duties" because it is "the general character of the remedy that guides [the Seventh Amendment] analysis, not the niceties of eighteenth-century chancery.").  Taken together, therefore, the first two prongs of the *Granfinanciera* test indicate that Ms. Ceruti and Summit Wind have a right to have their claim for breach of fiduciary duty decided by a jury.

Similarly, a jury may hear the parties' claims seeking declaratory relief.[6]  Both the Trustee and the Defendants seek declaratory judgment that the Lease Option Agreements were either valid or invalid.  To ascertain whether the Defendants may properly request a jury determination on this issue, the court must consider the overall context of the case: "Declaratory relief may be legal or equitable depending on the basic nature of the underlying issues."  *United States v. New Mexico*, 642 F.2d 397, 400 (10th Cir. 1981).  Although the Defendants stress that such a judgment hinges on a court's interpretation of state contract law and its application to the option contracts, this fact alone is not dispositive of the Defendants' right to a jury trial.  A bankruptcy judge is frequently charged with resolving disputes involving state law, and such determinations are necessary to the judge's ability to manage central aspects of a bankruptcy case, such as the determination of what property belongs to the estate.

But looking at the overall nature of the case, the declaratory judgment claims were not

---

[6]While the court wishes to be precise on this point, the court is aware that it is unlikely that a jury will decide the claims for declaratory judgment, since these claims appear to involve purely legal determinations that may be decided on a dispositive motion.  The court discusses below whether a bankruptcy court may properly issue a final judgment on such a motion.

brought to determine whether the Lease Option Agreements were properly part of the REDCO estate. The option contracts, whether they are valid or not, have already been sold. The reduced price for which CCW purchased the Agreements reflects the fact that the validity of the option contracts was uncertain when they were sold. The outcome of the declaratory judgment claims will not make the Lease Option Agreements any more or less a part of the bankruptcy estate, and the claims are therefore distinct from the type of actions a trustee might bring to augment a bankruptcy estate. Instead, the declaratory judgment claims here support the parties' additional claims for tortious and other injuries that have traditionally been decided in courts of law with the option of a jury as factfinder. Indeed, the claims for declaratory judgment are central to the resolution of the remaining legal causes of action. As a result, the declaratory judgment claims are legal in nature and the Defendants may properly request that a jury determine any factual issues necessary to the resolution of these claims.

The only relief the parties seek that could be deemed equitable in nature is Ms. Ceruti and Summit Wind's request for the restitution of legal fees that they paid to the Trustee's law firm. The Supreme Court has described restitution as an equitable remedy. *Tull v. United States*, 481 U.S. 412, 424 (1987) (holding that an action for disgorgement of improper profits, a type of restitution, is "traditionally considered an equitable remedy."). But the Seventh Circuit has noted that the Supreme Court did not state that restitution was an exclusively equitable remedy, and found that "restitution is a legal remedy when ordered in a case at law." *Reich v. Continental Gas Co.*, 33 F.3d 754, 756 (7th Cir. 1994). In any event, the Supreme Court also held in *Tull* that the Constitution requires a jury to decide issues common to legal and equitable claims: "[I]f a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including

all issues common to both claims, remains intact." *Tull*, 481 U.S. at 425 (citation omitted). Because the facts underlying Ms. Ceruti and Summit Wind's claim for unjust enrichment overlap and intertwine with the other issues in the counterclaims, the right to a jury trial extends to the unjust enrichment claim regardless of whether the court views the claim as inherently legal or equitable.

There are two remaining causes of action for which the court finds that the Defendants are not entitled to a jury trial. First, Ms. Ceruti and Summit Wind seek a declaratory judgment that Mr. Hofmann and his firm are disqualified from acting as Trustee and counsel for Trustee in the REDCO bankruptcy. This cause of action is moot because Ms. Loveridge was appointed the Chapter 7 Trustee of the REDCO bankruptcy estate on August 7, 2012.

Second, the Trustee has brought a cause of action for violation of the automatic stay under 11 U.S.C. § 362(k). The Trustee seeks an award of actual damages to the estate, as well as punitive damages for a willful violation of the stay. Under the first two prongs of the *Granfinanciera* test, the Trustee's claim would appear to be legal in nature. This cause of action lacks any history in the courts of 18th-century England, but the requested relief is for money damages, both compensatory and punitive. This remedy points toward the courts of law rather than the courts of equity. *See In re Glenn*, 359 B.R. 200, 203 (Bankr. N.D. Ill. 2006).

But the court must also apply the third prong of *Granfinanciera* and ask whether "Congress may assign and has assigned" the matter to the bankruptcy court. *Granfinanciera*, 492 U.S. at 42. Since Congress may deny jury trial rights to claimants litigating under statutory causes of action where public rights are litigated, the court must determine whether the Trustee's claim for violation of the automatic stay is a public right or a private right. *In re Gonzalez*, 2010

WL 3395677, at *2 (Bankr. D.P.R. Aug. 23, 2010). While there is a "dearth of law on this issue," the court agrees with a number of courts who have addressed the question and finds that "the rights created by section 362(k)(1) are so fundamental to our bankruptcy system that they are appropriately resolved by a bankruptcy judge sitting without a jury and that they should, therefore, be viewed as 'public rights' as that term is used in *Granfinanciera*." *Glenn*, 359 B.R. at 204-05; *see also Gonzalez*, 2010 WL 3395677; *Gordon v. Friedman's Inc. (In re Gordon)*, 209 B.R. 414 (Bankr. D. Miss. 1997). As a result, Congress has permissibly assigned the resolution of this claim to the bankruptcy court and the Defendants are not entitled to a jury trial on the issue of whether they violated the automatic stay.

The third prong of the *Granfinanciera* test does not affect the Defendants' right to a jury trial for the other claims and counterclaims that the court discussed above. Unlike the cause of action under 11 U.S.C. § 362(k), the claim for tortious interference and the counterclaims against the Trustee are more properly viewed as private rights. Like the fraudulent conveyance actions discussed in *Granfinanciera*, the tortious interference claims and counterclaims "constitute no part of the proceedings in bankruptcy but concern controversies arising out of it." *Granfinanciera*, 492 U.S. at 56 (citation omitted). Congress may not remove a party's right to a jury trial for these state-created causes of action merely because they are closely intertwined with a bankruptcy action.

The court has carefully considered whether it has drawn an appropriate distinction between the Trustee's claim for violation of the automatic stay and the Trustee's claim for tortious interference with economic relations. The allegations supporting these two claims and the requested relief are nearly identical. But while Congress clearly intended for a trustee to have

the authority to enforce the automatic stay, which is a fundamental feature of the bankruptcy scheme that Congress enacted, the court sees no evidence showing that Congress believed that the remedy it created under 11 U.S.C. § 362(k) for a violation of that stay was inadequate. The Trustee is certainly free to bring additional causes of action against alleged violators of the stay, but he cannot do so without implicating a defendant's right to have a jury decide these issues. Even if the allegations are identical to the assertions underpinning a claim for violation of the automatic stay, these additional state-created rights of action "are quintessentially suits at common law." *Id.*

In addition, the importance of the Seventh Amendment right to a jury trial requires that this right receive primacy where it is implicated: "Where both legal and equitable relief are sought by a plaintiff, the Seventh Amendment right to a jury trial requires that the legal claims be tried first, to a jury." *Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004) (citation omitted). For the same reason that a jury must first decide any factual issues that are common to a plaintiff's request for both legal and equitable relief, the court finds that a jury must also first decide any factual issues that are common to a plaintiff's private and public rights of action. Because the Trustee asserted state law causes of action against the Defendants, the bankruptcy court should not resolve the claim for a violation of the automatic stay until the jury has decided the common factual issues, if any, that are necessary to resolve both the violation claim and the tortious interference claim.

The court notes that the same reasoning does not apply to the Defendants' counterclaims. An alleged violator of the automatic stay cannot preempt a bankruptcy court's determination of the stay issue simply by asserting a number of private rights of action against a trustee that

involve common matters. These counterclaims may be tried to a jury, but they should not affect the timing of the bankruptcy court's resolution of the trustee's claim. In contrast, where it is the trustee who brings both a claim for violation of the automatic stay and additional rights of action, the Seventh Amendment requires an ordering of the resolution of these claims that allows a jury to decide any common issues first.

For the reasons stated above, the court finds that the Defendants are entitled to a jury trial on the Trustee's claim for tortious interference, as well as the Trustee's causes of action for declaratory judgment that support the Trustee's tortious interference claim. While Congress has properly assigned the resolution of the Trustee's claim for violation of the automatic stay to the bankruptcy judge to be decided without a jury, the bankruptcy court should first allow the jury to determine any issues that are common to the Trustee's private rights of action and this public right. The Defendants also have a right to have their counterclaims heard by a jury. Nothing that the court has said concerning the Defendants' right to a jury affects the bankruptcy court's authority to issue final judgments on any of these claims during pretrial motions. The court analyzes below this separate issue of whether the bankruptcy court maintains this authority after the Supreme Court's ruling in *Stern*.

### B. Waiver of the Right to a Jury Trial

The Trustee argues that, even if the Defendants have a right to a jury trial under *Granfinanciera*, they have waived this right through their participation in the bankruptcy proceeding. The Tenth Circuit has held that "one who invokes the jurisdiction of the bankruptcy court by filing a claim with that court or who fails to object to the summary jurisdiction of the court at the earliest opportunity, thereby consents to such jurisdiction." *O'Dell v. United States*,

326 F.2d 451, 455 (10th Cir. 1964).  The Trustee contends that the Defendants have consented to the bankruptcy court's jurisdiction by filing objections and contesting the Trustee's sale of the Lease Option Agreements.

The court is not persuaded by the Trustee's argument.  Mr. Hall and Ellis-Hall originally appeared in this case after the bankruptcy court issued an Order to Show Cause why they should not be held in contempt for violating the automatic stay.  These Defendants later objected, twice, to the Trustee's request to the bankruptcy court to hold that the option contracts were property of the bankruptcy estate for purposes of selling these contracts.  After the first objection, counsel for these Defendants admitted that they lacked standing to object to the relevant time frames and withdrew their objection.  (*See* Minute Entry, May 29, 2012, Bankr. Case No. 11-38145.)  After the second objection, the bankruptcy court ruled that Mr. Hall and Ellis-Hall lacked standing and could not participate in the evidentiary hearing.  (*See* Minute Entry, June 18, 2012, Bankr. Case No. 11-38145.)  The court finds that an appearance made to defend allegations of violating the automatic stay followed by a finding that these Defendants lacked standing to voice their objections is not a valid waiver of the Defendants' Seventh Amendment right to a jury.

Similarly, Summit Wind has not waived its jury trial rights.  Summit Wind is not a party in the underlying bankruptcy proceeding and it does not appear that Summit Wind filed any objections to the sale of the Lease Option Agreements.  While Summit Wind may have been one of the Hall Parties who appeared at the evidentiary hearing to contest the Trustee's Motion to Approve the Sale, Judge Thurman ruled that all of the Hall Parties lacked standing to participate.  For the reasons stated above, this attempted appearance does not constitute a waiver.  As a result, none of the Defendants' requests for a jury trial are barred by the Defendants' actions in the

bankruptcy proceeding.

C.  Timing of the Removal to the District Court

The Defendants argue that, because they are entitled to a jury trial and have timely demanded the exercise of this right, sufficient cause exists for the court to withdraw the automatic reference to the bankruptcy court.  The Defendants cite the Tenth Circuit case of *In re Latimer* for this proposition.  918 F.2d 136 (10th Cir. 1990).  But in *Latimer*, the Tenth Circuit merely restated its previous holding that jury trials cannot be conducted by the bankruptcy court and must instead be removed to district court.  *See In re Kaiser Steel Corp.*, 911 F.2d 380, 392 (10th Cir. 1990).  These cases do not require the immediate withdrawal of the district court's reference to the bankruptcy court and the Tenth Circuit has never prevented the bankruptcy court from supervising discovery and ruling on pretrial motions.  Instead, a number of district and bankruptcy courts have declined to withdraw the bankruptcy reference until a case is ready for trial.  *See, e.g.*, *South Valley Health Ctr., LLC v. Johnson (In re South Valley Health Ctr., LLC)*, 2013 WL 2387678, at *2 (D. Utah May 30, 2013) (unpublished); *Rhino Energy LLC v. C.O.P. Coal Dev. Co. (In re C.W. Mining Co.)*, 2012 WL 4882295, at *5 (D. Utah Oct. 15, 2012); *In re Kinderknecht*, 2011 WL 841141, at *4 (Bankr. D. Kan. Mar. 4, 2011).  This approach capitalizes on the bankruptcy court's familiarity with the proceedings and ensures that judicial resources are not wasted.  In addition, allowing the bankruptcy court to conduct the pretrial proceedings alleviates the risks of forum shopping:

> Motions to withdraw pose significant risks of forum shopping because a party can observe the bankruptcy judge's rulings, and then decide whether to bring the motion . . . .  By waiting to decide the withdrawal motion until the eve of a jury trial, the district court takes this power out of the hands of the parties.

*City Bank v. Compass Bank*, 2011 WL 5442092, at *6 (W.D. Tex. Nov. 9, 2011).

The court finds such an approach is appropriate in this matter, especially since the need for a trial may be obviated if the claims and counterclaims are decided on pretrial motions. Accordingly, the court holds that the Defendants' demand for a jury trial does not require the court to withdraw the reference to the bankruptcy court at this time.

## III.    The Bankruptcy Court's Authority to Issue Final Judgments

The Defendants argue that an additional reason for the court to withdraw the reference in this case is that, under *Stern v. Marshall*, the bankruptcy court does not have the authority to enter final judgments on either the Trustee's claims or Ms. Ceruti and Summit Wind's counterclaims, all of which depend on state law to some degree.  The court is not persuaded by the Defendants' argument and finds that the Defendants read *Stern* too broadly.  The Defendants' interpretation would carve out a large category of claims for which a bankruptcy judge could no longer enter final judgment, even though these claims are closely intertwined with bankruptcy proceedings and bankruptcy judges have traditionally ruled on them in the past.  While there is admittedly a great deal of uncertainty in this area of law, the court declines to mandate such a substantial change in bankruptcy practice in the absence of clear guidance from either the Supreme Court or the Tenth Circuit.

First, the court notes that *Stern* is not a jurisdictional decision, but one that is focused only on the bankruptcy court's authority under Article III to enter final judgment on certain claims:

> *Stern* makes clear that the issues of jurisdiction and final adjudicative power are distinct.  Consenting to jurisdiction—which everyone agrees the Bankruptcy Court possesses under the 'related to' doctrine enshrined in 28 U.S.C. § 1334—is

not the same as consenting to the entry of a final determination by a non-Article III tribunal . . . .

*Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 471 (S.D.N.Y. 2011); *see also Walker, Truesdell, Roth & Assocs. v. Blackstone Grp., L.P. (In re Extended Stay, Inc.)*, 466 B.R. 188, 201 (S.D.N.Y. 2011) ("*Stern* is not a decision concerning subject matter jurisdiction."). In other words, *Stern* does not require a district court to withdraw the reference to a bankruptcy court immediately whenever a *Stern*-related issue arises. Instead, a bankruptcy judge can manage pretrial matters and even issue findings of fact and conclusions of law that can be reviewed de novo by the district court. As a result, the issue presented to the court is the narrow question of whether the bankruptcy court has authority to resolve pretrial dispositive motions by entering final judgments or if it must instead issue recommendations to the district court on these motions.[7]

There is no question that the bankruptcy court continues to have the authority to enter judgment on the Trustee's claim for violation of the automatic stay. As the court discussed

---

[7]The court notes that there is not yet a general consensus as to whether a bankruptcy court may issue a report and recommendations for claims that are statutorily core matters but that nevertheless fall outside a bankruptcy court's authority to issue final judgments under *Stern*. Under 28 U.S.C. § 157(c)(1), a bankruptcy court may hear and submit proposed findings of fact and conclusions of law to the district court, subject to de novo review, in a non-core proceeding. But the statute does not contain a similar authorization for core proceedings, and courts have reached differing conclusions about what to do in these instances. *Compare Wellness Int'l Network, Ltd. v. Sharif*, 2013 WL 4441926, at *21 (7th Cir. Aug. 21, 2013) (finding that the order of reference in a bankruptcy proceeding should be withdrawn for core matters that fall afoul of *Stern* because there is no statutory authority for the bankruptcy court to issue proposed findings and conclusions in these circumstances) *with Adelphia Recovery Trust v. FLP Grp., Inc.*, 2012 WL 264180, at *6 (S.D.N.Y. Jan. 30, 2012) (finding that "Congress's failure to anticipate *Stern*, and provide bankruptcy courts with the explicit power to issue findings of fact and conclusions of law in core matters, . . . is not dispositive" and allowing the bankruptcy court to issue a report and recommendations). Because the court finds that there is no *Stern* problem for the claims and counterclaims in this action, the court need not address this debate.

above, the automatic stay is fundamental to the bankruptcy system enacted by Congress. *See Turner v. First Cmty. Credit Union (In re Turner)*, 462 B.R. 214, 221 (Bankr. S.D. Tex. 2011) ("Given the central role of the automatic stay in the bankruptcy scheme, the broad effect of the automatic stay, and the fiduciary duty imposed upon debtors, this Court concludes that enforcement of the automatic stay fits within the 'public rights' exception."). A bankruptcy court may not only enter final judgment on a claim for violation of the automatic stay, but it may do so without a jury.

The harder question is whether *Stern* imposes any limitations on the bankruptcy court's authority to enter final judgment on the remaining claims and counterclaims, especially the Trustee's cause of action for tortious interference with economic relations and Ms. Ceruti and Summit Wind's actions against the Trustee. The court has found that these claims are private legal rights that require a jury trial if one is properly demanded. As discussed above, some courts have interpreted *Stern* broadly, even to the extent of making its reach coextensive with the holding in *Granfinanciera*. In other words, if a claim requires a jury trial because it is not so central to the bankruptcy scheme that it could be labeled a public right, then these courts hold that *Stern* requires an Article III court to enter final judgment on the claim as well. The United States District Court for the Southern District of New York provides an example of this reasoning in the context of fraudulent conveyance actions:

> The *Stern* Court compares the *claim* at issue in *Stern* to that in *Granfinanciera*. It makes no mention of the differing legal contexts. *Stern* thus leaves no room for a fraudulent conveyance claim that is somehow a matter of private right in a Seventh Amendment context, but a matter of public right in an Article III context. Simply put, fraudulent conveyance claims in *Stern* and *Granfinanciera* are matters of either public or private right; they cannot be both.

*In re Lyondell Chem. Co.*, 467 B.R. 712, 722 (S.D.N.Y. 2012) (emphasis in original).

The court admits the logic of this approach, but finds that a narrower interpretation of *Stern* is equally logical. *Stern* clearly holds that the public rights exception does not save the bankruptcy court's authority to finally adjudicate certain actions, such as state law counterclaims filed by the estate against creditors who assert a proof of claim. But it is not clear whether the bankruptcy court's authority could be saved by other factors. *Stern* does not explicitly state that a bankruptcy judge cannot enter final judgment on any private right of action, but simply denies this authority for some private rights of action. And in its decision, the *Stern* Court discusses a number of factors besides the public rights exception. For instance, the Court notes that the parties did not unanimously consent to final adjudication by a non-Article III tribunal. *Stern*, 131 S. Ct. at 2618. The Court also finds that Vickie's state law counterclaim would not necessarily be resolved in ruling on Pierce's proof of claim. *Id.* at 2608; *see also id.* at 2618 (noting that Vickie's claim was a state tort action that existed "without regard to any bankruptcy proceeding."). As a result, the Court appears to be concerned not only with the distinction between public and private rights, but also with the question of consent and the determination of how closely an action is intertwined with the bankruptcy proceeding.

Given the additional factors discussed in *Stern*, the court adopts a narrow view of that holding and finds that, even if an action is more appropriately considered to be a private action for purposes of the Seventh Amendment analysis, such an action may nevertheless be so intricately intertwined with the bankruptcy proceeding that the bankruptcy court maintains its authority to enter a final judgment in that action under Article III.

The claims and counterclaims at issue here provide an example of why the court

distinguishes its analysis under *Stern* from its analysis under *Granfinanciera*. The Trustee's claim for tortious interference and the Defendants' counterclaims are clearly based in state law and resemble private rights of action. As a result, the Defendants may properly demand a jury trial under *Granfinanciera*. But it is also clear that these claims spring directly out of the bankruptcy proceeding itself. The Trustee's claims all arise out of conduct that allegedly violated the automatic stay, which is a creation of bankruptcy law. And the counterclaims relate to the Trustee's management of the estate and whether the Trustee maintained an appropriate relationship with the Defendants while performing these management functions. Even if the claims are not themselves public rights, on the facts presented here they are closely intertwined with the public bankruptcy scheme. Given this direct relationship to the bankruptcy proceeding, the court interprets *Stern* to allow the bankruptcy judge to retain authority to enter final judgment on the claims and counterclaims.

The court also notes that the claims at issue here are clearly distinguishable from the state law counterclaims that Vickie brought against Pierce in *Stern*. Pierce's alleged tortious interference with Vickie's inheritance preceded the creation of Vickie's bankruptcy estate and any actions taken by the bankruptcy court. Her claim against Pierce would have existed regardless of whether she sought bankruptcy protection. In contrast, all of the claims at issue here arise out of the management of the bankruptcy estate and the bankruptcy proceedings themselves.

The court's ruling accords with the decisions discussed above holding that bankruptcy courts continue to have the authority to enter final judgment on fraudulent conveyance actions. Similarly, the court finds itself in agreement with the decisions issued by the Honorable Ted

Stewart, who has also held that a narrow interpretation of *Stern* is appropriate. Finally, the court follows the Supreme Court's own statement that its decision in *Stern* did not "meaningfully change[] the division of labor" in the current bankruptcy scheme. *Stern*, 131 S. Ct. at 2620. It is certainly possible that either the Tenth Circuit or the Supreme Court will at some point issue a decision inconsistent with this narrow interpretation, but the facts of this case illustrate the difficulty of reading the *Stern* decision broadly in the absence of additional clarification. The causes of action at issue here do not fit neatly into a recognized class of actions, such as fraudulent conveyance claims, state law counterclaims on a creditor's proof of claim, or, as noted above, actions to augment the bankruptcy estate. While the court has relied on existing caselaw to determine whether the mix of state law and bankruptcy claims in this action require a jury trial under the Seventh Amendment, the court is hesitant to perform a similarly detailed analysis under Article III. Such an approach would throw into doubt the bankruptcy court's ability to enter final judgment on a wide variety of claims, thereby substantially changing the division of labor in the bankruptcy statute. The court therefore awaits further guidance before denying the bankruptcy court's traditional authority to enter final judgments on additional classes of claims other than the state law counterclaims explicitly mentioned in *Stern*.

One final consideration supports the court's decision on this matter. The court has not yet addressed whether the claims and counterclaims at issue here are core or non-core claims as defined by the Bankruptcy Code. While the Trustee asserts that all of the causes of action are core claims, the parties did not extensively brief this issue. The court has proceeded under the assumption that the Trustee is correct, but believes that the bankruptcy court has been granted the authority and is in a better position to determine for itself whether a claim presents a core or a

non-core issue. If the bankruptcy court determines that a cause of action is non-core, then the

bankruptcy judge will issue findings of fact and conclusions of law that will be reviewed by the

district court de novo. *See* 28 U.S.C. § 157(c)(1). As a result, any *Stern* problem is moot for

matters that are deemed non-core because the bankruptcy court will only issue a report and

recommendations and not a final judgment for these claims. The Defendants' Motion to

Withdraw the Reference at this stage in the litigation, at least to the extent that the Defendants

seek to withdraw the reference under *Stern*, has the effect of preempting the bankruptcy's

determination of whether the issues presented to it are core or non-core. For this reason, the

Defendants' Motion is also premature.[8]

CONCLUSION

For the reasons stated above, the Defendants' Joint Motion to Withdraw the Reference for

Adversary Proceeding 12-2225 (Dkt. No. 2) is DENIED WITHOUT PREJUDICE. The parties

may refile their motion when, and if, any remaining issues are ready to be submitted for a jury

trial. The court GRANTS the Trustee's Motion to Substitute Party (Dkt. No. 9) and has

substituted Ms. Loveridge as REDCO's Chapter 7 Trustee in these proceedings.

---

[8]Even though the court finds that the Defendants' Motion is premature, the court has addressed the merits of the Defendants' argument under *Stern* because of the importance of the question presented and the likelihood that many, if not all, of the claims and counterclaims at issue are core matters. *See, e.g.*, *Kirk v. Hendon (In re Heinsohn)*, 231 B.R. 48, 59 (Bankr. E.D. Tenn. 1999) (holding that a plaintiff's action against a trustee was a core proceeding).

SO ORDERED this 23rd day of September, 2013.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge